IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action |
| | ) | No. 4:13-cv-01522-RBH |
| and | ) | |
| | ) | |
| STATE OF SOUTH CAROLINA by and through | ) | |
| the DEPARTMENT OF HEALTH AND | ) | |
| ENVIRONMENTAL CONTROL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF TIMMONSVILLE, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CITY OF FLORENCE, | ) | |
| | ) | |
| Permissively Joined Party Pursuant to | ) | |
| Fed. R. Civ. P. 20(a)(2)(A). | ) | |
| _____ | ) | |

**CONSENT DECREE**

# **TABLE OF CONTENTS**

I.      INTRODUCTION .......................................................................................... 1
II.     JURISDICTION AND VENUE ...................................................................... 8
III.    APPLICABILITY ........................................................................................... 9
IV.     OBJECTIVES .............................................................................................. 11
V.      DEFINITIONS .............................................................................................. 12
VI.     REVIEW, APPROVAL, AND IMPLEMENTATION OF DELIVERABLES .............. 19
VII.    COMPLIANCE REQUIREMENTS ............................................................... 23
VIII.   WORK TO BE PERFORMED ....................................................................... 23
IX.     REPORTING REQUIREMENTS .................................................................. 34
X.      STIPULATED PENALTIES .......................................................................... 38
XI.     FORCE MAJEURE ....................................................................................... 42
XII.    DISPUTE RESOLUTION ............................................................................. 44
XIII.   INFORMATION COLLECTION AND RETENTION ....................................... 47
XIV.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........................... 49
XV.     COSTS ......................................................................................................... 51
XVI.    NOTICES ..................................................................................................... 52
XVII.   EFFECTIVE DATE ...................................................................................... 54
XVIII.  RETENTION OF JURISDICTION ................................................................. 54
XIX.    MODIFICATION .......................................................................................... 54
XX.     TERMINATION ........................................................................................... 55
XXI.    PUBLIC PARTICIPATION .......................................................................... 56
XXII.   SIGNATORIES/SERVICE ............................................................................ 56
XXIII.  INTEGRATION ........................................................................................... 57
XXIV.   FINAL JUDGMENT ..................................................................................... 58
XXV.    APPENDICES .............................................................................................. 58

## **Appendices**

Appendix A:   List of Items that Must Be Included with NPDES WET Reports

## **Attachments**

Attachment 1: Agreement to Convey Utility and Grant Franchise between Town of Timmonsville and City of Florence

## I.  <u>INTRODUCTION</u>

1.      WHEREAS, Plaintiffs the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and the South Carolina Department of Health and Environmental Control ("SCDHEC"), on behalf of the State of South Carolina, have filed a Complaint in this action concurrently with this Consent Decree, alleging that the Town of Timmonsville, South Carolina (hereinafter "Defendant" or "Timmonsville"), violated Section 301 of the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987 ("Clean Water Act" or "CWA"), 33 U.S.C. § 1311; violated Sections 48-1-90(A)(1) and 48-1-110(d) of the South Carolina Pollution Control Act ("SCPCA"), S.C. Code Ann. §§ 48-1-90(A)(1) and -48-1-110(d); and violated Section 44-55-80(A) of the State Safe Drinking Water Act, as amended ("SC Safe Drinking Water Act" or "SC SDWA"), and the State Primary Drinking Water Regulations ("SPDWRs") promulgated by the State of South Carolina at 4 S.C. Code Ann. Regs. 61-58 pursuant to the SC SDWA, S.C. Code Ann. §§ 44-55-10 to -120 (2002 & Supp. 2011); and seeking injunctive relief and civil penalties pursuant to Sections 309(b) and (d) and 504(a) of the CWA, 33 U.S.C. §§ 1319(b) and (d) and 1364(a); Sections 48-1-50(4) and 48-1-330 of the SCPCA, S.C. Code Ann. §§ 48-1-50(4) and 48-1-330; and Section 44-55-90(B)(1) and (C) of the SC SDWA, S.C. Code Ann. § 44-55-90(B)(1) and (C).

2.      WHEREAS, the Parties to this Consent Decree are the Town of Timmonsville, South Carolina; the City of Florence, South Carolina (hereinafter "Florence"); SCDHEC, on behalf of the State of South Carolina; and the United States, on behalf of the EPA.

3.      WHEREAS, SCDHEC is charged with the statutory duty of enforcing the SC SDWA, pursuant to S.C. Code Ann. §§ 44-55-10 to -120 and the regulations promulgated pursuant thereto.

4.      WHEREAS, the EPA is charged with the statutory duty of enforcing the CWA, pursuant to 33 U.S.C. § 1251 *et. seq*. and the regulations promulgated pursuant thereto.

5.      WHEREAS, SCDHEC is charged with the statutory duty of enforcing the SCPCA, pursuant to S.C. Code Ann. § 48-1-10 to -350 and the regulations promulgated pursuant thereto.

6.      WHEREAS, SCDHEC, on behalf of the State of South Carolina, is also a plaintiff in this action and is also joined as a party under Section 309(e) of the CWA, 33 U.S.C. § 1319(e), which requires the state in which a municipality is located to be joined as a party whenever the municipality is a party to a civil action brought by the United States under Section 309 of the CWA.

7.      WHEREAS, Timmonsville, a municipality, owns and operates a Publicly Owned Treatment Works ("POTW") in Timmonsville, Florence County, South Carolina, which includes a wastewater treatment plant (hereinafter "WWTP") and corresponding sanitary sewer collection and transmission system (hereinafter "SSS") conveying sanitary wastewaters to the WWTP.

8.      WHEREAS, the Complaint alleges that Timmonsville violated the CWA, 33 U.S.C. §§ 1251-1387, for failing to comply with the requirements of its National Pollutant Discharge Elimination System ("NPDES") Permit No. SC0025356, which SCDHEC issued to Timmonsville on June 17, 2002, with an effective date of August 1, 2002, and an expiration date

2

of September 30, 2006 (hereinafter "Permit A"); and which the EPA re-issued to Timmonsville on August 31, 2006, with an effective date of October 1, 2006, and an expiration date of August 31, 2008 (hereinafter "Permit B").  In March 2008, Timmonsville submitted its reapplication for Permit No. SC0025356 to SCDHEC.  On March 26, 2008, SCDHEC informed Timmonsville that its reapplication was incomplete, and granted Timmonsville an extension of time until July 14, 2008 to resubmit a completed application.  On July 10, 2008, Timmonsville submitted a completed reapplication for Permit No. SC0025356 to SCDHEC.  SCDHEC administratively continued Timmonville's Permit No. SC0025356 effective July 18, 2008.[1]

9.      WHEREAS, the Complaint alleges that Timmonsville failed to comply with the requirements of Permits A and B in the following manners: operations and maintenance violations; numerous pretreatment program implementation and reporting violations; at least 442 effluent monitoring and/or reporting violations; at least 482 effluent limit violations; and at least 49 releases of untreated or partially-treated wastewater.  The Complaint alleges that Timmonsville had these violations of its NPDES Permits beginning April 1, 2003, through the date of the Complaint.

10.     WHEREAS, the EPA issued an administrative order against Timmonsville, Docket Number CWA-04-2005-4803, on September 27, 2005, (hereinafter "AO-1"), pursuant to Section 309(a) of the CWA, 33 U.S.C. § 1319(a), for whole effluent toxicity ("WET") violations and thereby failure to comply with the requirements of NPDES Permit A.  Plaintiffs allege that Timmonsville did not fully comply with the requirements of AO-1.

---

[1] Under 40 C.F.R. § 122.6(d), an EPA-issued NPDES permit does not continue in force beyond its expiration date under Federal law if, at that time, a State is the permitting authority under the CWA.  States authorized to administer the NPDES program, such as South Carolina, may continue EPA-issued permits until the effective date of new permits.  See also 4 S.C. Code Ann. Regs. 61-9-122.6.

3

11.    WHEREAS, the EPA issued an administrative order against Timmonsville,
Docket Number CWA-04-2008-4751, on November 30, 2007, (hereinafter "AO-2"), pursuant to
Sections 308 and 309(a)(3) of the CWA, 33 U.S.C. §§ 1318 and 1319(a)(3), for effluent limit,
operations and maintenance violations, and thereby failure to comply with the requirements of
NPDES Permit B.  Plaintiffs allege that Timmonsville did not fully comply with the
requirements of AO-2.

12.    WHEREAS, Timmonsville owns and/or operates public water system (or "PWS")
No. 2110005, which provides water for human consumption to the Town of Timmonsville.

13.    WHEREAS, SCDHEC conducted sanitary surveys of Timmonsville's PWS No.
2110005 on March 27, 2006 and March 26, 2007, both of which documented PWS deficiencies.
SCDHEC issued Consent Order No. 07-118-DW ("2007 SDWA Consent Order") against
Timmonsville on August 3, 2007 relative to Timmonsville's PWS No. 2110005, in which
SCDHEC found that, overall, the PWS was unsatisfactory and that Timmonsville had violated
the SPDWRs, 4 S.C. Code Ann. Regs. 61-58, in that Timmonsville had failed to properly operate
and maintain the PWS.  Plaintiffs allege that Timmonsville failed to fully comply with the 2007
SDWA Consent Order.  SCDHEC subsequently conducted another sanitary survey of
Timmonsville's PWS No. 2110005 on November 30, 2009, which documented additional PWS
deficiencies.  SCDHEC amended the 2007 SDWA Consent Order on March 11, 2010
(hereinafter "2007 SDWA Consent Order Amendment").  Plaintiffs allege that Timmonsville
failed to fully comply with the 2007 SDWA Consent Order Amendment.

14.    WHEREAS, SCDHEC conducted a sanitary survey of Timmonsville's PWS No.
2110005 on November 23, 2010, which documented further PWS deficiencies.  SCDHEC issued

4

Consent Order No. 11-011-DW ("2011 SDWA Consent Order") against Timmonsville on March 10, 2011 relative to Timmonsville's PWS No. 2110005, in which SCDHEC found that, overall, the PWS was unsatisfactory and that Timmonsville had violated the SPDWRs, 4 S.C. Code Ann. Regs. 61-58, in that Timmonsville had failed to properly operate and maintain the PWS. Timmonsville submitted a Corrective Action Plan ("2011 CAP") to SCDHEC on April 27, 2011 pursuant to the 2011 SDWA Consent Order. SCDHEC approved the 2011 CAP on May 11, 2011, thus making the 2011 CAP an enforceable part of the 2011 SDWA Consent Order. Plaintiffs allege that Timmonsville failed to fully implement the 2011 CAP.

15.    WHEREAS, SCDHEC conducted a sanitary survey of Timmonsville's PWS No. 2110005 on September 27, 2012, which documented further PWS deficiencies.

16.    WHEREAS, SCDHEC conducted a sanitary survey of Timmonsville's PWS No. 2110005 on March 19, 2013, which documented further PWS deficiencies.

17.    WHEREAS, Timmonsville contends that it currently does not have the necessary resources to operate the POTW and PWS in manners that are compliant with the CWA, the SCPCA, and the SC SDWA, and, as a result, Timmonsville has expressed its willingness and desire to transfer the POTW and PWS to an entity with the financial and technical capabilities to rehabilitate, operate and maintain the facilities.

18.    WHEREAS, Florence was approached by the EPA, SCDHEC and Timmonsville to determine whether, in the interest of protecting human health and the environment, Florence would entertain the possibility of operating and/or acquiring the POTW and PWS in Timmonsville; this contact resulted in Timmonsville and Florence beginning discussions in late 2012 regarding the transfer of the POTW and PWS facilities to Florence.

5

19.     WHEREAS, the discussions between Timmonsville and Florence resulted in a written agreement ("Agreement to Convey Utility and Grant Franchise") memorializing the terms and conditions under which a transfer of the POTW and PWS facilities from Timmonsville to Florence will occur upon the passage of a special election allowing the conveyance and transfer, which transfer will occur after the Effective Date of this Consent Decree and after the successful conclusion of the other conditions set out in said Agreement to Convey Utility and Grant Franchise.  The Agreement to Convey Utility and Grant Franchise is attached hereto as Attachment 1.

20.     WHEREAS, it is the intent of Florence and Timmonsville that, upon the Effective Date of this Consent Decree, they shall immediately proceed to close the transaction which will result in Florence becoming the owner and operator of the POTW and the PWS and that the Timmonsville POTW and PWS facilities will become part of Florence's POTW and PWS operations.

21.     WHEREAS, as of the Effective Date of this Consent Decree and thus the date of transfer of the POTW from Timmonsville to Florence, the POTW does not fully comply with the CWA, the SCPCA, and the requirements of NPDES Permit No. SC0025356 and, thus, as the owner and operator of the POTW, Florence, though not responsible for the current and ongoing failures in compliance, shall become responsible for the POTW's future compliance with the CWA, the SCPCA, and NPDES Permit No. SC0025356.

22.     WHEREAS, as of the Effective Date of this Consent Decree and thus the date of transfer of the PWS from Timmonsville to Florence, the PWS does not fully comply with the SC SDWA, the 2007 SDWA Consent Order, the 2007 Consent Order Amendment, and the 2011 SDWA Consent Order and, thus, as the owner and operator of the PWS, Florence, though not

responsible for the current and ongoing failures in compliance, shall become responsible for the PWS's future compliance with the SC SDWA.

23.     WHEREAS, all Parties acknowledge that bringing the POTW and PWS into compliance will require significant amounts of construction over the time periods referred to herein.

24.     WHEREAS, the joinder of Florence as a party to this Consent Decree pursuant to Fed. R. Civ. P. 20(a)(2)(A) is appropriate because Plaintiffs can assert their rights to relief against both Timmonsville and Florence relating to or arising out of the ownership and/or operation of the POTW and PWS, and because some questions of law or fact common to all the parties will arise in the action.  In addition, as a successor and assignee of Timmonsville, Florence shall be bound by the terms of this Consent Decree pursuant to Section III (Applicability) of this Consent Decree.  Florence is therefore a signatory to this Consent Decree.

25.     WHEREAS, Timmonsville's and Florence's agreements to this Consent Decree are not admissions of liability, except for their consents to jurisdiction and venue as provided in Section II (Jurisdiction and Venue) of this Consent Decree, nor are they adjudications or admissions of any fact or law.

26.     WHEREAS, the Parties stipulate that settlement of Plaintiffs' claims in accordance with the terms of this Consent Decree is in the public interest and have agreed to entry of this Consent Decree without trial of any issues, and the Parties hereby stipulate that, in order to resolve these claims stated in the Plaintiffs' complaint, this Consent Decree should be entered.

27.     WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW THEREFORE, in consideration of the recitals and violations described above and in the interest of settling all civil claims and controversies before taking any testimony and without adjudication of any fact or law, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.     JURISDICTION AND VENUE

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367(a); Sections 309(b) and 504(a) of the CWA, 33 U.S.C. §§ 1319(b) and 1364(a); Section 48-1-50(4) of the SCPCA, S.C. Code Ann. § 48-1-50(4); and Section 44-55-90(C) of the SC SDWA, S.C. Code Ann. § 44-55-90(C).

29.     Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391(b) and Sections 309(b) and (e) and 504(a) of the CWA, 33 U.S.C. §§ 1319(b) and (e) and 1364(a), because it is the judicial district where Defendant is located, where a substantial part of the events or omissions giving rise to the claim occurred, and where the alleged violations occurred.

30.     The United States has authority to bring this action on behalf of the Administrator of EPA ("Administrator") under Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

31.     Pursuant to 33 U.S.C. § 1342(b), the State of South Carolina has been authorized to administer its NPDES program since June 10, 1975, and SCDHEC is therefore authorized to bring this action on behalf of the State of South Carolina.

32.     SCDHEC is charged with implementation of the SC SDWA, S.C. Code Ann. §§ 44-55-10 to -120 (2002 & Supp. 2011) and the regulations promulgated thereunder.  SCDHEC brings its SC SDWA claims under supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.

33.     For purposes of this Consent Decree, or any action to enforce this Consent Decree, Timmonsville and Florence consent to the Court's jurisdiction over this Consent Decree and any such action and over Timmonsville and Florence, and consent to venue in this judicial district.

34.     For purposes of this Consent Decree, Timmonsville agrees that the Complaint states claims upon which relief may be granted pursuant to Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), and Section 44-55-90 of the SC Safe Drinking Water Act, S.C. Code Ann. § 44-55-90.

35.     Notice of commencement of this action has been given to SCDHEC on behalf of the State of South Carolina pursuant to § 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b).

## III.        APPLICABILITY

36.     The obligations of this Consent Decree apply to and are binding upon the United States, SCDHEC, and Defendant and any of Defendant's successors, assigns, or other entities or persons otherwise bound by law.  As a result of the Agreement to Convey Utility and Grant Franchise, the obligations of this Consent Decree upon the Effective Date shall apply to and

become binding upon Florence as the successor and assignee of Timmonsville.  Even though it was not responsible in any way for the failures in compliance as discussed above and as outlined in the Complaint filed in this action, Florence hereby agrees, upon the Effective Date of this Consent Decree, to fulfill the obligations of the "Defendant" as set forth in this Consent Decree and that the terms and conditions of this Consent Decree applicable to the "Defendant" shall be applicable to and binding upon Florence. The use of the term "Defendant" in this Consent Decree in conjunction with Florence shall, in no way, be interpreted to indicate any prior noncompliance or wrongdoing by Florence.

37.    No transfer of ownership or operation of the POTW or PWS, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of this Consent Decree are implemented.  At least thirty (30) Days prior to such transfer, Defendant shall provide a copy of this Consent Decree to any such proposed transferee and shall simultaneously provide written notice of any such prospective transfer, together with a copy of the proposed written agreement, to the United States and SCDHEC in accordance with Section XVI of this Decree (Notices).  Defendant shall require, as a condition of any sale or transfer, that any such purchaser or transferee agrees in writing to be bound by this Consent Decree and submit to the jurisdiction of the Court for its enforcement. Any attempt to transfer ownership or operation of the POTW or PWS without complying with this Paragraph constitutes a violation of this Consent Decree.

38.    Within thirty (30) Days after the Effective Date of this Consent Decree, Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any substantive provision of this

Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendant shall condition any such contract upon performance of the Work in conformity with the terms of this Consent Decree.

39.     In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

**IV.     <u>OBJECTIVES</u>**

40.     The Parties recognize that the POTW and the PWS, which have been operated by Timmonsville through the Effective Date of this Consent Decree, are presently in poor repair and are not in full compliance with the CWA, the SCPCA, and/or the SC SDWA. The express purpose of the Parties entering into this Consent Decree is to arrange for and facilitate Florence acquiring the POTW and PWS so that Florence can take all measures necessary to: (a) fulfill the objectives of and achieve full compliance with the CWA and the SCPCA, the regulations promulgated thereunder, and NPDES Permit No. SC0025356 for the POTW, with the goal of meeting all permitted effluent limits, complying with all pretreatment regulations, and, eliminating all sanitary sewer overflows ("SSOs"), including Building/Private Property Backups, and Prohibited Bypasses; and (b) fulfill the objectives of and achieve full compliance with the SC SDWA and the regulations promulgated thereunder. All plans, reports, construction, remedial maintenance, and other obligations in this Consent Decree, and under any amendment to this Consent Decree, shall have the objective of ensuring that Defendant complies with the CWA, the SCPCA, the SC SDWA, all applicable federal and state regulations, and the terms and conditions of Permit No. SC0025356.

## V.    DEFINITIONS

41.    Terms used in this Consent Decree that are defined in the CWA, the SCPCA, the SC SDWA, or in regulations promulgated pursuant to the CWA, the SCPCA, or the SC SDWA, shall have the meanings assigned to them in those acts or such regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.    "2007 SDWA Consent Order" shall mean the SC Safe Drinking Water Act Consent Order No. 07-118-DW issued by SCDHEC against Timmonsville on August 3, 2007, and the amendment to the 2007 SDWA Consent Order, issued by SCDHEC against Timmonsville on March 11, 2010 (hereinafter "2007 SDWA Consent Order Amendment").

b.    "2011 SDWA Consent Order" shall mean the SC Safe Drinking Water Act Order No. 11-011-DW issued by SCDHEC against Timmonsville on March 10, 2011, and including the Corrective Action Plan submitted by Timmonsville to SCDHEC on April 27, 2011 and approved by SCDHEC on May 11, 2011 (hereinafter "2011 CAP").

c.    "Building/Private Property Backup" shall mean a Sanitary Sewer Overflow in the form of wastewater release or backup into a building or onto private property that is caused by blockages, flow conditions, or other malfunctions in the sanitary sewer system. A wastewater backup or release that is caused by blockages, flow conditions, or other malfunctions of a Private Lateral is not a Building/Private Property Backup for purposes of this Consent Decree.

d.    "Bypass" shall have the meaning set forth at 40 C.F.R. § 122.41(m).

e.    "Calendar Quarter" shall mean the three (3) month periods ending on March 31, June 30, September 30, and December 31.

12

f.      "Calendar Year" shall mean the twelve (12) month period starting on January 1 and ending on December 31.

g.      "Capacity, Management, Operations, and Maintenance" or "CMOM" shall mean, for the purpose of this Consent Decree only, a program of accepted industry practices to properly manage, operate, and maintain sanitary sewer systems, investigate capacity-constrained areas of these systems, and respond to SSO events.

h.      "Certification" or "Certify," when used in this Consent Decree, shall require Defendant(s) to comply with Paragraph 50 of this Consent Decree.

i.      "City of Florence," "Florence," or "City" shall mean the City of Florence, South Carolina, including all of its departments, agencies, instrumentalities, and any successor thereto.

j.      "Complaint" shall mean the complaint filed by the United States and SCDHEC in this action.

k.      "Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto and listed in Section XXIII of this Consent Decree (Integration).  In the event of a conflict between this document and any appendix, this document shall control.

l.      "CWA" shall mean the Clean Water Act, as amended, 33 U.S.C. §§ 1251 *et seq.*

m.      "Date of Entry" shall mean the date on which this Consent Decree is entered by the United States District Court for the District of South Carolina

n.      "Date of Lodging" shall mean the date on which this Consent Decree is lodged with the Clerk of the Court for the United States District Court for the District of South Carolina.

13

o.    "Day" (whether or not capitalized) shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

p.    "Defendant" shall mean the Town of Timmonsville, South Carolina, including all of its departments, agencies, instrumentalities, and any successor and assign thereto. In accordance with Paragraph 36 and the Agreement to Convey Utility and Grant Franchise, Florence, to which the ultimate transfer of the POTW and PWS is anticipated, shall assume the obligations of "Defendant" for the purposes of this Consent Decree, upon completion of the transfer.

q.    "Deliverable" shall mean any written document required to be prepared and/or submitted by or on behalf of Defendant pursuant to this Consent Decree.

r.    "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

s.    "Effective Date" shall have the definition provided in Section XVII (Effective Date) of this Consent Decree;

t.    "Force Main" shall mean any pipe that receives and conveys, under pressure, wastewater from the discharge side of a pump.  A Force Main is intended to convey wastewater under pressure.

u.    "Gravity Sewer Line" shall mean a pipe that receives, contains and conveys wastewater not normally under pressure, but is intended to flow unassisted under the influence of gravity.  Gravity sewers are typically not intended to flow full under normal operating conditions.

14

v.    "Gravity Sewer Main System" shall mean all of the Gravity Sewer Lines owned and operated by Defendant.

w.    "Holding Pond" shall mean the unlined holding pond located adjacent to the Timmonsville WWTP, which has a capacity of approximately 43 million gallons.[2]

x.    "Infiltration," as defined by 40 C.F.R. § 35.2005(b)(20), shall mean water other than wastewater that enters a sewer system (including sewer service connections and foundation drains) from the ground through such means as defective pipes, pipe joints, connections, or manholes.

y.    "Inflow," as defined by 40 C.F.R. § 35.2005(b)(21), shall mean water other than wastewater that enters a sewer system (including sewer service connections) from sources such as, but not limited to, roof leaders, cellar drains, yard drains, area drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, cooling towers, storm water, surface runoff, street wash waters, or drainage.

z.    "I/I" shall mean the total quantity of water from Infiltration and Inflow without distinguishing the source(s).

aa.    "March 19, 2013 SCDHEC Sanitary Survey" shall mean sanitary survey of the PWS conducted by SCDHEC on March 19, 2013, and transmitted to the Town on April 11, 2013.

bb.    "Month" shall mean one calendar month running from the numbered day to the same numbered day of the following calendar month, regardless of whether the particular

---

[2] Prior to July 10, 2008, the holding pond was a permitted part of the Timmonsville WWTP and served as a storage lagoon.  As used herein, "holding pond" refers to the unlined, unpermitted pond located adjacent to the Timmonsville WWTP.  As used herein, "storage lagoon" refers to the same pond, but as part of the permitted WWTP.

month has 28, 29, 30, or 31 days.  In the case where a triggered event would occur on a day of the month which does not exist (*e.g.*, February 30), then the event shall be due on the first (1st) day of the following month (*e.g.*, March 1).

cc.    "NPDES" shall mean National Pollutant Discharge Elimination System, as established by 33 U.S.C. § 1342.

dd.    "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral.

ee.    "Parties" shall mean the United States, SCDHEC, Timmonsville, and Florence.

ff.    "Permit No. SC0025356" or "NPDES Permit" shall mean NPDES Permit No. SC0025356 issued to Timmonsville pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, for the POTW, and any future extended, modified, or reissued permit.

gg.    "POTW Treatment Plant" or "WWTP" shall mean that portion of the Timmonsville POTW located at 706 South Hill Street, Timmonsville, South Carolina, which is designed to provide treatment of municipal sewage and industrial waste and all components of such treatment facility.

hh.    "Private Lateral" shall mean that portion of the Sanitary Sewer System, not owned by Defendant, used to convey wastewater from a building or buildings to that portion of the Sanitary Sewer System owned by Defendant.

ii.    "Prohibited Bypass" shall mean the intentional diversion of waste streams from any portion of a treatment facility which is prohibited pursuant to the terms set forth at 40 C.F.R. § 122.41(m).

16

jj.    "Public Water System" or "PWS" shall mean PWS No. 2110005, which serves the customers of the Town of Timmonsville in Florence County, South Carolina.

kk.    "Publicly Owned Treatment Works" or "POTW" shall mean the treatment works in Timmonsville, Florence County, South Carolina, which includes the Timmonsville POTW Treatment Plant and separate Sanitary Sewer System, regulated pursuant to the NPDES Permit and under the CWA.

ll.    "Pumping Station" shall mean facilities comprised of pumps which lift wastewater to a higher hydraulic elevation, including all related electrical, mechanical, and structural systems necessary to the operation of that pumping station.

mm.    "Sanitary Sewer Overflow" or "SSO" shall mean an overflow, spill, diversion, or release of wastewater from or caused by the SSS.  This term shall include: (i) discharges to waters of the State or United States from the SSS; and (ii) any release of wastewater from the SSS to public or private property that does not reach waters of the United States or the State, including Building/Private Property Backups.

nn.    "Sanitary Sewer System" or "SSS" shall mean the municipal sanitary wastewater collection and transmission systems, including all pipes, force mains, gravity sewer lines, lift stations, pumping stations, manholes and appurtenances thereto conveying wastewater to the WWTP, which are part of the POTW.

oo.    "SCDHEC" shall mean the State of South Carolina's Department of Health and Environmental Control and any of its successor departments or agencies.

pp.    "SCPCA" shall mean the State of South Carolina's Pollution Control Act, S.C. Code Ann. §§ 48-1-50 to -350, as amended.

17

qq.     "SC SDWA" shall mean the State of South Carolina's State Safe Drinking Water Act, S.C. Code Ann. §§ 44-55-10 to -120, as amended.

rr.     "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

ss.     "September 27, 2012 SCDHEC Sanitary Survey" shall mean sanitary survey of the PWS conducted by SCDHEC on September 27, 2012, and transmitted to the Town on October 9, 2012.

tt.     "State" shall mean the State of South Carolina, including all its departments, agencies, and instrumentalities, and any successor departments, agencies, and instrumentalities.

uu.     "Subparagraph" shall mean a portion of a paragraph identified by lowercase letters.

vv.     "Timely," when applied to the submittal of a Deliverable, shall mean submitted no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and containing all of the elements pertaining to the submittal as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree.  "Timely," when applied to the implementation of any Work, shall mean implemented no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and in accordance with the elements pertaining to such Work as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree).

ww.     "Town of Timmonsville," "Timmonsville," or "Town" shall mean the Town of Timmonsville, South Carolina, including all of its departments, agencies, instrumentalities, and any successor thereto.

18

xx.    "United States" shall mean the United States of America, acting on behalf of the EPA, including all its departments, agencies, and instrumentalities, and any successor departments, agencies, and instrumentalities.

yy.    "Work" shall mean all activities Defendant is required to perform under this Consent Decree.

## VI.    REVIEW, APPROVAL, AND IMPLEMENTATION OF DELIVERABLES

42.    This Section applies to all Deliverables required under this Consent Decree.

43.    EPA Action on Deliverables.  After review of any Deliverable that is required to be submitted pursuant to this Consent Decree, the EPA, after consultation with SCDHEC, shall in writing:

a.    approve the submission;

b.    approve the submission upon specified conditions;

c.    approve part of the submission and disapprove the remainder; or

d.    disapprove the submission.

44.    Approved Deliverables.  If the submission is approved pursuant to Subparagraph 43(a), Defendant shall take all actions required by Deliverable in accordance with the schedules and requirements of the Deliverable as approved.  If the submission is conditionally approved or approved only in part, pursuant to Subparagraphs 43(b) or 43(c), Defendant shall, upon written direction from the EPA, after consultation with SCDHEC, take all actions required by the approved plan, report, or other item that the EPA, after consultation with SCDHEC, determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions under Section XII of this Decree

19

(Dispute Resolution).  Following EPA approval of any Deliverable or portion thereof, such Deliverable or portion thereof so approved shall be incorporated into and become enforceable under this Consent Decree.

45.     <u>Disapproved Deliverables</u>.  If the submission is disapproved in whole or in part pursuant to Subparagraphs 43(c) or 43(d), subject to Defendant's right to dispute only the specified conditions or the disapproved portions under Section XII of this Consent Decree (Dispute Resolution), Defendant shall, within forty-five (45) Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit to the EPA the Deliverable, or disapproved portion thereof, for approval, in accordance with the Paragraphs 43 and 44.  If the resubmission is approved in whole or in part, Defendant shall proceed in accordance with the Paragraph 44.

46.     <u>Stipulated Penalties Accruing</u>.  Subject to Defendant's right to dispute only the specified conditions or the disapproved portions under Section XII of this Consent Decree (Dispute Resolution), any stipulated penalties applicable to the original Deliverable, as provided in Section X of this Consent Decree (Stipulated Penalties), shall accrue during the forty-five (45)-Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Consent Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

47.     <u>Resubmitted Deliverable</u>.  If a resubmitted Deliverable, or portion thereof, is disapproved in whole or in part, the EPA, after consultation with SCDHEC, may again require

20

Defendant to correct any deficiencies, in accordance with Paragraph 45, or may itself/themselves correct any deficiencies, subject to Defendant's right to invoke Dispute Resolution pursuant to Section XII of this Consent Decree (Dispute Resolution) and the right of the EPA and SCDHEC to seek stipulated penalties as provided in the Paragraph 46.  Upon the EPA's correction of any deficiencies, such resubmitted Deliverable or portion thereof shall be incorporated into and become enforceable under this Consent Decree and shall be implemented by Defendant according to the approved schedule, subject to Defendant's right to invoke Dispute Resolution pursuant to Section XII of this Consent Decree (Dispute Resolution).

48.    <u>Timing of Review of Deliverables</u>.  The EPA and SCDHEC agree to use best efforts to expeditiously review and comment on all Deliverables required pursuant to this Consent Decree.  If the EPA issues written comments and decisions on any Deliverable more than sixty (60) Days after receipt of such submission, any subsequent deadline or milestone that is dependent upon such comments or decisions shall be extended.  The length of the extension shall be determined by calculating the number of Days between the EPA's receipt of the submission and the date of the EPA's written response, less sixty (60) Days.  Within thirty (30) Days of the date that Defendant knows or should know of a deadline or milestone that Defendant believes is extended under this Paragraph, Defendant shall inform the EPA, in writing, of its belief and the amount of time Defendant believes the deadlines or milestones are extended.  If the EPA disagrees with Defendant's determination that a deadline is dependent upon such comments or decisions, the EPA shall inform Defendant in writing.  Defendant may dispute the EPA's conclusion regarding whether a deadline is dependent upon such comments or decisions pursuant to Section XII of this Consent Decree (Dispute Resolution).

21

49.     The Parties recognize that Defendant may need or want to revise certain Deliverables submitted pursuant to this Consent Decree during the term of this Consent Decree. Such revisions shall not be considered modifications to the Consent Decree for purposes of Section XIX of this Consent Decree (Modification). Defendant must obtain the EPA's prior written approval of any revision to the substance of any Deliverable submitted pursuant to this Consent Decree. Defendant may revise the form of any Deliverable submitted pursuant to this Consent Decree without consulting the EPA. Defendant shall provide copies of any such revised Deliverable to the EPA and SCDHEC within seven (7) Days after making such revision.

50.     <u>Certification</u>. In all Deliverables, notices, documents, or reports required to be submitted to the United States and SCDHEC pursuant to this Consent Decree, Defendant shall, by a senior management official, sign and certify such Deliverables, notices, documents, or reports as follows:

> *I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.*

This Certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

## VII.     <u>COMPLIANCE REQUIREMENTS</u>

51.     Defendant shall comply with the Clean Water Act, the regulations promulgated thereunder, the SCPCA and the regulations promulgated thereunder, the SC SDWA and the regulations promulgated thereunder, and the NPDES Permit with respect to the POTW.

52.     Pursuant to the authorities of Sections 309(a) and 504(a) of the CWA, 33 U.S.C. §§ 1319(a) and 1364(a); Section 48-1-50(4) of the SCPCA, S.C. Code Ann. § 48-1-50(4), and Section 44-55-90 of the SC SDWA, S.C. Code Ann. § 44-55-90, Defendant hereby consents to the performance of the Work to be performed as described in Section VIII of this Consent Decree.

## VIII.     <u>WORK TO BE PERFORMED</u>

53.     <u>Repair and Rehabilitation of WWTP Sand Filters</u>.  Within three-hundred sixty-five (365) Days after the transfer of ownership of the POTW, pursuant to Paragraph 20, Defendant shall submit Certification to the EPA and SCDHEC that Defendant has completed removal and appropriate disposal of the filter media from Sand Filters Nos. 1 through 5 at Defendant's WWTP and replaced such filter media with new media to comply with sand filter specifications and/or operations and maintenance ("O&M") requirements. In recognition of the present environmental conditions caused by the failure of the Sand Filters and the bypass pumping that will be required to be continued until the repair and rehabilitation of the Sand Filters has been completed, Defendant agrees to utilize its emergency procurement procedures, as outlined in the City of Florence's "Purchasing and Contracting Policies and Procedures Manual,"[3] and to execute the requirements of this Paragraph as expeditiously as possible.

---

[3] *Available at* http://www.cityofflorence.com/docs/documents-financial-administration/city-of-florence-purchasing-and-contracting-procedures-manual-(pdf).pdf?sfvrsn=0.

54.    <u>Short-Term Management of the Holding Pond at Defendant's WWTP.</u>

a.    Defendant shall, within sixty (60) Days after the Certification of completion of repair and rehabilitation of the WWTP Sand Filters, as required by Paragraph 53, submit Certification to the EPA and SCDHEC that Defendant has drawn down the water level in the Holding Pond to attain twelve (12) vertical inches of freeboard in the Holding Pond, as measured from the lowest point of the top of the Holding Pond dike.

b.    Defendant shall, within ninety (90) Days after the Certification of completion of repair and rehabilitation of the WWTP Sand Filters, as required by Paragraph 53, submit Certification to the EPA and SCDHEC that Defendant has drawn down the water level in the Holding Pond to attain twenty-four (24) vertical inches of freeboard in the Holding Pond, as measured from the lowest point of the top of the Holding Pond dike.    If any contents of the Holding Pond are discharged through the WWTP to meet these requirements, then the pollutant loading shall be contributed at the headworks of the WWTP and shall be at a rate that will not cause or contribute to interference or pass-through as those terms are defined in 40 C.F.R. § 403.3.

55.    <u>Repair of Existing Collapsed Sewer Lines</u>.  Within one-hundred twenty (120) Days after the transfer of ownership of the POTW, pursuant to Paragraph 20, Defendant shall repair the three (3) known, existing collapsed sewer lines within Defendant's SSS at the intersections of East Market and Foxworth Streets, Tanyard and Byrd Streets, and Keith and Orange Streets.  Until such time that the repairs of the three (3) known existing collapsed sewer lines are complete, Defendant shall continue to operate the temporary pumps at the locations of the three (3) known, existing collapsed sewer lines, including keeping such pumps full of necessary fuel.

24

56.    <u>Repair Pump Stations</u>.  Within one-hundred eighty (180) Days after the Effective Date of this Consent Decree, Defendant shall submit certification to the EPA and SCDHEC that Defendant has obtained and installed two (2) properly-sized pumps and appurtenant equipment at any of those Pump Stations within Defendant's SSS where two properly-sized, functional and operational pumps were lacking as of the Date of Lodging of this Consent Decree.

57.    <u>Comprehensive Performance Evaluation and Comprehensive Correction Plan</u>.

a.    <u>Comprehensive Performance Evaluation ("CPE")</u>.  Within twelve (12) months after the Effective Date of this Consent Decree, Defendant shall prepare and submit a CPE for the WWTP, including a schedule of implementation, to EPA and SCDHEC for review and approval.

(i)    The purpose of this CPE is to identify any flow and/or loading rate restricted treatment process unit(s) at the WWTP that limit the WWTP's ability to comply with permit requirements.  The CPE shall also evaluate the cause of any effluent limit violation occurring at the WWTP since transfer of ownership of the POTW, pursuant to Paragraph 20.

(ii)    The CPE shall include an in-depth diagnostic evaluation of the capacity and operation of the WWTP in terms of its ability to meet all terms of the Permit.  The CPE shall employ flow modeling and/or other appropriate techniques to evaluate WWTP operations.  The CPE shall also identify the flow that the WWTP may take without experiencing a Prohibited Bypass.  The CPE shall establish procedures that Defendant will use to prepare a Comprehensive Correction Plan ("CCP"), as set forth below, based on the results of the CPE. Defendant shall propose, as part of its CPE, a schedule for submission of a CCP for the WWTP, provided, that such schedule shall not exceed six (6) Months after EPA approval of the CPE.  To

25

the extent applicable, the CPE shall be consistent with the EPA publications "Improving POTW Performance Using the Composite Correction Approach," EPA CERI, October 1984, and "Retrofitting POTWs," EPA CERI, July 1989.

   b. <u>Composite Correction Plan ("CCP")</u>.  Within six (6) Months after EPA and SCDHEC review and approval of the CPE, Defendant shall prepare and submit to EPA and SCDHEC for review and approval a CCP for the WWTP.  The purpose of the CCP is to identify specific remedial actions with schedules, including capital improvements and other upgrades to the WWTP, to address the problems identified in the CPE.

    (i) The CCP shall include specific Type 1 and Type 2 remedial actions (as those terms are used in the EPA publications "Improving POTW Performance Using the Composite Correction Approach," EPA CERI, October 1984, and "Retrofitting POTWs," EPA CERI, July 1989).

    (ii) The Type 1 and 2 remedial actions shall be designed towards the goal of achieving Permit compliance, including compliance with effluent limits, and eliminating factors which limit or which could limit the WWTP's operating efficiency.

    (iii) The CCP shall include an expeditious implementation and completion schedule for such Type 1 and 2 remedial actions.

    (iv) The CCP shall also include a plan for any possible specific long term upgrades to the WWTP, including capital improvements and Type 3 remedial actions (as that term is used in the EPA publications "Improving POTW Performance Using the Composite Correction Approach," EPA CERI, October 1984, and "Retrofitting POTWs," EPA CERI, July 1989), to achieve Permit compliance.

(v)    To the extent applicable, the CCP shall be consistent with the EPA publications "Improving POTW Performance Using the Composite Correction Approach," EPA CERI, October 1984, and "Retrofitting POTWs," EPA CERI, July 1989.

58.    Operations and Maintenance Programs.  Defendant shall amend its existing Capacity, Management, Operations, and Maintenance (CMOM) programs pursuant to Subparagraphs 58(a) through 58(c) below.

a.    Sanitary Sewer Overflow Response Plan ("SORP").  Within six (6) Months after the Effective Date of this Consent Decree, Defendant shall submit a SORP to the EPA and SCDHEC for review, comment, and approval.  The SORP shall be a reference for Defendant's personnel, and serve to consolidate and update Defendant's current written policies and procedures for: providing timely and effective methods and means of responding to, cleaning up, and/or minimizing the impact of SSOs; timely reporting of the pertinent information of SSOs to the appropriate regulatory agencies; and notifications to the potentially impacted public.

(i)    The SORP shall provide Defendant's personnel a series of standard operating procedures with step-wise instructions for how to:

A.    Report to SCDHEC the location of any SSO of 500 gallons or more by street address or any other appropriate method (i.e., latitude-longitude) within twenty-four (24) hours from the time Defendant becomes aware of the circumstances, in accordance with then-current laws, regulations and policies, and consistent with Defendant's NPDES Permit;

B.    Provide written reporting to SCDHEC in accordance with then-current laws, regulations and policies, and consistent with Defendant's NPDES Permit;

C.    In accordance with then-current laws, regulations and policies, and consistent with Defendant's NPDES Permit, maintain records including all written reports to

27

SCDHEC; maintain records documenting steps that have been and will be taken to prevent the SSO from recurring, including work order records associated with investigation and repair activities; and maintain a list of complaints from customers or others with the reported details regarding individual SSOs and their responses that can be used for trend analysis;

        D.    In accordance with then-current laws, regulations and policies, and consistent with Defendant's NPDES Permit, provide notice to the public of SSOs through the local news media or other means, including, as appropriate, signs or barricades to restrict access;

        E.    Estimate the volume of untreated wastewater released by a SSO, and to minimize the volume released;

        F.    Take emergency procedures for specific pump stations, install bypass/ pump-around strategies, and other means to prevent the exceedance of a pump station's storage capacity (i.e., maximum volume of sewage that can be stored in the event of a pump station failure or repair without causing a SSO and the time during which sewage can be stored before a SSO will occur);

        G.    Determine when additional storage or a pump-around strategy will be needed in the event that a repair may cause or lengthen the time of a SSO; and

        H.    Respond to any building backups determined to be directly caused by conditions in Defendant's Gravity Sewer Main System, including the methods for communicating with customers about how to report building backups and how to obtain clean-up, and including the timeframe for marshalling resources to correct or repair the condition causing or contributing to the building backup.

        (ii)    The SORP shall specify the procedures and frequencies necessary to provide adequate training for Defendant's employees, contractors, and personnel of other

affected agencies required to effectively implement the SORP and its standard operating procedures.

      b.        <u>Major Pump Stations' Power Loss Evaluation ("MPS-PLE")</u>.  Within twelve (12) Months after the Effective Date of this Consent Decree, Defendant shall submit a MPS-PLE to the EPA and SCDHEC for review, comment, and approval.  The MPS-PLE shall include an evaluation of the adequacy of Defendant's current backup power supplies and emergency procedures for preventing power outages at major pump stations.  "Major pump stations" as defined in this Subparagraph shall mean Two Mile Creek (i.e., Williamson Road), Police Cabin (i.e., High Hill Creek), Steel Road, Middle Swamp, and any other pump stations that may be so designated by Florence.

      (i)        The criteria used in the evaluation shall, at minimum, consider the following:

      A.        An adequate alternative power source must have sufficient capability to operate the station at its rated capacity, as well as operate all ancillary equipment and instrumentation;

      B.        Adequate emergency pumping capability is the ability to rapidly connect a portable pump to the pump station with the capability to handle that station's peak flows.  This includes providing "quick-connect" couplers for both pump suction and discharge;

      C.        Corrective action for a power outage must occur within the critical response time calculated for each pump station which is necessary to prevent a SSO; and

      D.        Sufficiency of the current inventory of portable pumps, and history of SSOs related to emergency equipment failures, power outages, and lightning strikes during the five (5) years prior to the Effective Date of this Consent Decree.

(ii)    The MPS-PLE submitted to the EPA and DHEC shall, for each major pump station:

A.    Provide detailed information about the current backup power, emergency pumping capability, and emergency procedures, and any deficiencies in meeting the calculated critical response time presented in minutes;

B.    Describe any equipment in place to protect against lightning strikes, and any deficiency;

C.    Identify the corrective measures necessary for each identified deficiency; and,

D.    Include an expeditious schedule to implement the identified corrective measures; provided, however, that such schedule shall not extend beyond twenty-four (24) Months after the Effective Date of this Consent Decree.  The schedule shall include, but is not limited to, equipping the Two Mile Creek and Middle Swamp pump stations with permanently installed generators that are wired to autonomously supply uninterrupted backup power.

c.    Gravity Sewer Mains Preventative Maintenance Program ("GSM-PMP").
Within twenty-four (24) Months of the Effective Date of this Consent Decree, Defendant shall submit a GSM-PMP for EPA and SCDHEC review, comment, and approval.  The objective of this program shall be to establish a prioritized strategy for the routine inspection of the entire Gravity Sewer Main System, and to establish written standard operating procedures which will act to prevent the sources of blockages in Gravity Sewer Lines.  Defendant's GSM-PMP shall establish appropriate inspection and cleaning rates for the Gravity Sewer Main System which are

30

consistent with the EPA's guidance, "Collection Systems O&M Fact Sheet: Sewer Cleaning and Inspection" (EPA 832-F-99-031, September 1999).

(i)     The GSM-PMP shall include the following sub-programs: a Gravity Line Inspection Program, a Routine Cleaning Program, and a Root Control Program.

(ii)     Each sub-program of the GSM-PMP shall include, but is not limited to, the following components: detailed guidance for personnel responsible for the activities; detailed guidance in the proper use of specific equipment; a calendar and map of the preventive maintenance schedules for specified areas of the gravity main system; standard forms, routes, reporting procedures, and safety procedures for use in the program; and procedures for maintaining and trending the data collected during the activities.

59.     Whole Effluent Toxicity.  Defendant shall take action pursuant to Subparagraphs 59(a) through 59(e) below with the objective of determining the source(s) of any continuing toxicity and reducing any such toxicity of the WWTP effluent in order to maintain compliance with the whole effluent toxicity ("WET") limits of the NPDES Permit.

a.     Accelerated Chronic WET Testing.  Beginning the first full month after the Certification of completion of repair and rehabilitation of the WWTP Sand Filters, as required by Paragraph 53, Defendant shall conduct a series of six (6) multi-concentration chronic WET tests using *Ceriodaphnia dubia,* with one test to be performed each Month for six (6) Months to evaluate compliance with the WET limits.  Unless the EPA and SCDHEC direct Defendant to act otherwise, Defendant may resume the chronic WET testing prescribed in the NPDES Permit upon completion of this series.

b.     Toxicity Reduction Evaluation ("TRE").  If the EPA and SCDHEC determine that a TRE is warranted for the WWTP within ninety (based upon the results being

reported for the accelerated chronic testing in Subparagraph 59(a), then within sixty (60) Days after the EPA so notifies Defendant, Defendant shall submit to the EPA and SCDHEC for review and comment a TRE plan and schedule designed to: identify the cause of the WET violations; isolate the source(s) of toxicity; evaluate the effectiveness of toxicity control options; implement the selected control option(s); and confirm the reduction in effluent toxicity.  The TRE plan shall be consistent with the procedures and protocols in "Toxicity Reduction Evaluation Guidance for Municipal Wastewater Treatment Plants," (hereinafter "TRE Guidance") or the most current edition (EPA/833B-99/002, available at http://www.epa.gov/npdes/pubs/tre.pdf).  Upon receipt of EPA and SCDHEC comments, Defendant shall begin implementation of the TRE plan with such comments incorporated, and submit a revised final TRE plan to the EPA and SCDHEC within thirty (30) Days.

   c. <u>TRE Confirmation Tests</u>.  If required to conduct a TRE pursuant to Subparagraph 59(b), then, after completion of the TRE, Defendant shall conduct a series of six (6) multi-concentration chronic WET tests using *Ceriodaphnia dubia,* one test to be performed each Month for six (6) Months to confirm compliance with the WET conditions of the NPDES Permit.  If these six (6) confirmation tests do not exhibit toxicity and are in compliance with the NPDES Permit, then Defendant can cease confirmation testing and resume the WET testing frequency prescribed in the NPDES Permit.  If one or more of the confirmation tests do exhibit toxicity and therefore are not in compliance with the NPDES Permit, then Defendant shall update the TRE plan, continue the TRE, and subsequently repeat the confirmation testing until such time as six (6) multi-concentration chronic WET tests using *Ceriodaphnia dubia*, performed once a Month for six (6) Months, are obtained which identify no toxicity and compliance with the WET conditions in the NPDES Permit.

d.     <u>Multi-concentration Chronic WET Tests</u>.  All multi-concentration chronic WET tests required under this Paragraph shall be conducted in compliance with the "Short-term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Waters to Freshwater Organisms," EPA-821-R-02-013 (Oct. 2002), or the most current edition; and 40 C.F.R. § 136.3 Table IA; and shall consist of a control and the following dilutions: 6.25%, 12.5%, 25%, 50%, and 100%.

e.     <u>WET Progress Reports</u>.  Defendant shall submit WET Progress Reports to the EPA and SCDHEC that describe Defendant's progress in complying with the terms of this Paragraph.  WET Progress Reports shall be included in Defendant's Quarterly Report required pursuant to Subparagraph 62(b) of this Consent Decree, and shall include, at a minimum:

(i)     Copies of all analytical results for WET tests conducted in the previous Calendar Quarter, including the information specified in <u>Appendix A</u>;

(ii)     Any explanations for WET tests that were not conducted as required in the previous Calendar Quarter; and,

(iii)     If a TRE is performed, then a written report detailing the activities conducted as part of the TRE since the last Calendar Quarter; any conclusions that have been deducted based on those activities; and next steps that will be conducted in the following Calendar Quarter.  If any adjustments need to be made to the schedule of the TRE based on the results of the previous Calendar Quarter's activities, then that information shall be provided in the Quarterly Report as well, as long as it is within the original overall completion timeline.

60.     <u>Local Limits Headworks Analysis and Evaluation Report</u>.  Within one-hundred twenty (120) Days after repair and rehabilitation of the WWTP Sand Filters, as required by Paragraph 53 of this Consent Decree, Defendant shall re-calculate a headworks evaluation to

reflect current conditions for the POTW and submit an Evaluation Report containing all of the elements required by Part III.D.3 of the NPDES Permit to the EPA and SCDHEC for review and approval.   Pollutants of concern identified for the POTW and the associated local limits proposed for such pollutants of concern in the Evaluation Report must be developed pursuant to the EPA's "Local Limits Development Guidance" (EPA 833-R-04-002 A/B, July 2004).  The pollutants of concern, headworks loadings, removal efficiencies, and inhibition values used to determine the proposed local limits shall be based on data obtained by current monitoring of the WWTP and SSS.   In the event that the collected monitoring data is not adequate, an explanation of the inadequacy and the alternative used shall be provided in the Evaluation Report.

61.    SDWA Corrective Action Plan.  Within sixty (60) Days after the Effective Date of this Consent Decree, Defendant shall submit a revised corrective action plan ("CAP") to SCDHEC for review and approval.  The CAP shall address all of the deficiencies documented in: the 2007 SDWA Consent Order (and 2010 Amendment); the 2011 SDWA Consent Order, including the 2011 CAP; and the September 27, 2012 SCDHEC Sanitary Survey.  The CAP shall include an expeditious implementation and completion schedule for such corrective actions not extending past twenty-four (24) Months after SCDHEC approval of the revised CAP.  Defendant shall comply with the approved CAP by correcting the identified deficiencies according to the schedule contained therein.

## IX.      REPORTING REQUIREMENTS

62.    Emergency Notification.  In accordance with then-current laws, regulations and policies, and consistent with Defendant's NPDES Permit, Defendant shall give oral notification to SCDHEC of any SSO of 500 gallons or more or of any Prohibited Bypass from the POTW

within twenty-four (24) hours from the time Defendant becomes aware the circumstances.  In addition, Defendant shall submit a written report of any such SSO of 500 gallons or more or any Prohibited Bypass to SCDHEC within five (5) Days of the time Defendant becomes aware of the circumstances, in accordance with then-current laws, regulations and policies, and consistent with Defendant's NPDES Permit.  Each notification or report made pursuant to this Paragraph shall include, at a minimum, the following information: (i) a description of the noncompliance and its cause; (ii) the period of noncompliance, including exact dates and times; and (iii) if the noncompliance has not been corrected, the anticipated time it is expected to continue and steps taken or planned to reduce, eliminate and prevent recurrence of the noncompliance.

63.    <u>Quarterly Reports</u>.  Beginning twenty-eight (28) Days after the first (1st) full three (3) Month period following the Effective Date of this Consent Decree, and twenty-eight (28) Days after each subsequent three (3) Month period thereafter until one year after the Effective Date of this Consent Decree, and then semi-annually thereafter until termination of this Consent Decree pursuant to Section XX (Termination), Defendant shall submit to the EPA and SCDHEC for review and comment a Quarterly Report by email and certified mail, return receipt requested.  The Quarterly Report shall include, at a minimum:

a.    a description of all projects and activities conducted during the most recently completed Calendar Quarter to comply with the requirements of this Consent Decree;

b.    a WET Progress Report, pursuant to Subparagraph 59(e) above;

c.    a status report on pending revisions to the significant industrial user permit for Honda.  A copy of the revised permit shall be included no later than the second Quarter Report after the Effective Date of this Consent Decree;

35

d.      an assessment of the effectiveness of actions taken to prevent SSOs and Prohibited Bypasses;

e.      a list of all SSOs and Prohibited Bypasses that occurred during the Calendar Quarter.  The list shall include: date and time, location (including pump station names, as appropriate), ultimate destination, estimated volume, and the specific cause;

f.      a description of Defendant's plan to address and prevent each listed SSO and each Prohibited Bypass from reoccurring in the future; and

g.      a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violations likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify the EPA and SCDHEC of such violation and its likely duration, in writing, within ten (10) working Days of the Day Defendant first becomes aware of the violation, with an explanation of the violations likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the Quarterly Report.  Defendant shall investigate the cause of the violation and shall then submit an amendment to the Quarterly Report, including a full explanation of the cause of the violation, within thirty (30) Days of the Day Defendant becomes aware of the cause of the violation.  Nothing in this Paragraph or Paragraph 64 relieves Defendant of its obligation to provide the notice required by Section XI of this Consent Decree (Force Majeure).

64.    Annual Reports.  Beginning sixty (60) Days after the first (1st) full twelve (12)-Month period following the Effective Date of this Consent Decree, and sixty (60) Days after

36

each subsequent twelve (12)-Month period until Termination of this Consent Decree pursuant to Section XX (Termination), Defendant shall submit to the EPA and SCDHEC for review and approval an Annual Report .  Each Annual Report shall cover the most recent applicable twelve (12)-Month period and shall contain a summary of the CMOM Programs implemented pursuant to Paragraph 58 of this Consent Decree, including a comparison of actual performance with any performance measures that have been established.  The Annual Report shall also contain a summary of each remedial measure and capital project implemented pursuant to this Consent Decree, including a description of Defendant's compliance with the requirements of Section VIII (Work to be Performed) of this Consent Decree.

65.     Except as otherwise provided herein or in any approved Deliverable, whenever any violation of this Consent Decree, or of any applicable permits, or any other event affecting Defendant's performance under this Consent Decree, or the performance of the POTW and/or the PWS, may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify the EPA and SCDHEC orally or by electronic or facsimile transmission as soon as possible, but no later than twenty-four (24) hours after Defendant first knew of the violation or event.  This procedure is in addition to the requirements set forth in the Paragraph 62.

66.     <u>Monthly Status Updates</u>.  Defendant shall participate in status update meetings and/or conference calls with representatives of the EPA and SCDHEC no less frequently than monthly, unless otherwise approved by the EPA and SCDHEC.  Such monthly status update meetings shall continue through completion of the Work, unless otherwise approved by the EPA and SCDHEC.

67.     All reports shall be submitted to the persons designated in Section XVI of this Consent Decree (Notices).

68.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Clean Water Act, the SC Safe Drinking Water Act, or their implementing regulations, or by any other federal, State, or local law, regulation, permit, or other requirement.

69.     Notification to the EPA or SCDHEC pursuant to this Section of an anticipated delay shall not by itself excuse the delay or otherwise satisfy the notification requirements set forth in Section XI of this Consent Decree (Force Majeure).

70.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## X.        STIPULATED PENALTIES

71.     Defendant shall be liable to the United States and SCDHEC for stipulated penalties as specified below, unless excused under Section XI of this Consent Decree (Force Majeure).

72.     A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

73.     <u>Noncompliance for Deliverables</u>.  Stipulated penalties shall accrue per violation per Day for failure to Timely submit a Deliverable  in accordance with the requirements of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $250.00 | 1st through 30th Day |
| $500.00 | 31st through the 60th Day |
| $1,000.00 | 61st Day and Beyond |

74.     <u>SSOs Reaching Waters of the United States and Prohibited Bypasses</u>.

a.     For each SSO reaching waters of the United States and for each Prohibited Bypass occurring from one (1) year after the Effective Date of this Consent Decree to two (2) years after the Effective Date of the this Consent Decree, a stipulated penalty of $250 per SSO and $250 per Prohibited Bypass may be assessed.  For each SSO reaching waters of the United States and for each Prohibited Bypass occurring on or after the second year after the Effective Date, a stipulated penalty of $500 per SSO and $500 per Prohibited Bypass may be assessed.

b.     Notwithstanding the foregoing Subparagraph 74.a, Defendant shall not be liable for such a stipulated penalty for an SSO reaching waters of the United States or Prohibited Bypass if all of the following conditions are met: (i) Defendant stopped such SSO or Prohibited Bypass as soon as reasonably practicable; (ii) Defendant is in full compliance with and is fully implementing the schedules and other requirements set forth pursuant to Sections VII, VIII, and IX of this Consent Decree; and (iii) Defendant has demonstrated its full compliance will all reporting requirements for such SSOs and/or Prohibited Bypasses, including, but not limited to, those set forth in Paragraphs 62 and 63.

39

75.     The stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

76.     Defendant shall pay stipulated penalties to the United States and SCDHEC within thirty (30) Days of receiving a written demand by either Plaintiff. Defendant shall pay fifty (50) percent of the total stipulated penalty amount due to the United States and fifty (50) percent to SCDHEC. The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiffs.

77.     The United States or SCDHEC may, in the unreviewable exercise of their respective discretion, reduce or waive any Stipulated Penalties otherwise due to that Plaintiff under this Consent Decree.

78.     Stipulated penalties shall continue to accrue as provided in Paragraphs 71 through 75, during any Dispute Resolution, but need not be paid until the following:

a.     If the dispute is resolved by agreement or by a decision of the EPA or SCDHEC that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States or SCDHEC within thirty (30) Days of the effective date of the agreement or the receipt of the EPA's or SCDHEC's decision or order;

b.     If the dispute is appealed to the Court and the United States or SCDHEC prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph 78(c) below.

40

c.      If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

79.     Defendant shall pay stipulated penalties owing to the United States by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to Defendant, following Entry of the Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the District of South Carolina, 1441 Main Street, Suite 500, Columbia, South Carolina  29201.  At the time of payment, Defendant shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for stipulated penalties pursuant to the Consent Decree in United States, et al. v Town of Timmonsville, et al., and shall reference the civil action number and DOJ case number 90-5-1-1-09597, and shall state for which violation(s) the penalties are being paid.

80.     Defendant shall pay stipulated penalties owing to SCDHEC by certified check payable to SCDHEC, and mail it to Robert L. Proctor, Enforcement Officer, SCDHEC-Bureau of Water, WP Compliance and Enforcement Section, 2600 Bull Street, South Carolina  29201.

81.     If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States or SCDHEC from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

82.     Subject to the provisions of Section XIV of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or SCDHEC for Defendant's violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a violation of the Clean Water Act, Defendant shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation.

## XI.      **FORCE MAJEURE**

83.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, which delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise best efforts to fulfill the obligation, includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event: (a) as it is occurring; and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible.  Force Majeure does not include Defendant's financial inability to perform any obligation under this Consent Decree.

84.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission to the EPA and SCDHEC, as soon as possible, but not later than seventy-two (72) hours of when Defendant first knew that the event might cause a delay.  Within seven (7) Days thereafter, Defendant shall provide in

writing to the EPA and SCDHEC an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors, knew or should have known.

85.     If the EPA, after a reasonable opportunity for review and comment by SCDHEC, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by the EPA, after a reasonable opportunity for review and comment by SCDHEC, for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  The EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

86.     If the EPA, after a reasonable opportunity for review and comment by SCDHEC, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, the EPA will notify Defendant in writing of its decision.

87.     If Defendant elects to invoke the dispute resolution procedures set forth in Section XII of this Consent Decree (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of the EPA's notice.  In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs and 83 and 84.  If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to the EPA and the Court.

## XII.        DISPUTE RESOLUTION

88.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  However, the procedures of this Section shall not apply to actions by the United States or SCDHEC to enforce Defendant's obligations that have not been disputed in accordance with this Section.  Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States or SCDHEC to enforce any obligation of Defendant arising under this Decree.

44

89.    <u>Informal Dispute Resolution</u>.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendant sends the United States and SCDHEC a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States, after consultation with SCDHEC, shall be considered binding unless, within thirty (30) Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

90.    <u>Formal Dispute Resolution</u>.  Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and SCDHEC a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

91.    The United States, after consultation with SCDHEC, shall serve its Statement of Position within forty-five (45) Days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

45

92.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States and SCDHEC, in accordance with Section XVI of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

93.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

94.     <u>Standard of Review</u>.

a.     <u>Disputes Concerning Matters Accorded Record Review</u>.  Except as otherwise provided in this Consent Decree, in any dispute brought under this Section pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by the EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b.     <u>Other Disputes</u>.  Except as otherwise provided in this Consent Decree, in any other dispute brought under this Section, Defendant shall bear the burden of demonstrating

46

that its position complies with this Consent Decree and better furthers the Objectives of the Consent Decree.

95.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 78.  If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X of this Consent Decree (Stipulated Penalties).

## XIII.     INFORMATION COLLECTION AND RETENTION

96.     The United States, SCDHEC, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a.     monitor the progress of activities required under this Consent Decree;

b.     verify any data or information submitted to the United States or SCDHEC in accordance with the terms of this Consent Decree;

c.     obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

d.     obtain documentary evidence, including photographs and similar data; and

e.     assess Defendant's compliance with this Consent Decree.

97.     Upon request, Defendant shall provide the EPA and SCDHEC or their authorized representatives, splits of any samples taken by Defendant.  Upon request, the EPA and SCDHEC shall provide Defendant splits of any samples taken by the EPA or SCDHEC.

98.     Until five (5) years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States or SCDHEC, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

99.     At the conclusion of the information-retention period provided in the Paragraph 98, Defendant shall notify the United States and SCDHEC at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or SCDHEC, Defendant shall deliver any such documents, records, or other information to the EPA or SCDHEC.  Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Defendant asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the

48

document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Defendant.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

100.    Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

101.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or SCDHEC pursuant to applicable federal or State laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XIV.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

102.    This Consent Decree resolves the civil claims of the United States and SCDHEC for the violations alleged in the Complaint filed in this action through the Effective Date of this Consent Decree.

103.    This Consent Decree has been negotiated under the assumption that Timmonsville and Florence will successfully complete the conveyance of the POTW and PWS, and the grant of franchise to transfer the POTW and PWS to Florence.  If, for any reason, the conveyance does not occur and Timmonsville remains the owner and/operator of the POTW and/or PWS, or ownership and/or operation of the POTW and/or PWS revert back to Timmonsville's ownership

and/or operation, Timmonsville agrees that it is obligated to fully comply with all the requirements of this Consent Decree and acknowledges that it may be subject to further legal action by the United States and SCDHEC to address all the violations addressed in the Complaint.  Should the conveyance not occur, Florence will be relieved of any and all responsibilities hereunder.

104.     The United States and SCDHEC reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 102. This Consent Decree shall not be construed to limit the rights of the United States or SCDHEC to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 102.  The United States and SCDHEC further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the POTW and/or PWS, whether related to the violations addressed in this Consent Decree or otherwise.

105.     In any subsequent administrative or judicial proceeding initiated by the United States or SCDHEC for injunctive relief, civil penalties, other appropriate relief relating to the POTW, PWS, or Defendant's violations, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or SCDHEC in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 102 of this Section.

106.    This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and SCDHEC do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Clean Water Act, 33 U.S.C. § 1251 et seq., the SC Safe Drinking Water Act, S.C. Code Ann. § 44-55-10 et seq., or with any other provisions of federal, State, or local laws, regulations, or permits.

107.    This Consent Decree does not limit or affect the rights of the Parties to this Consent Decree  against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Timmonsville or Florence, except as otherwise provided by law.

108.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XV.    COSTS

109.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and SCDHEC shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XVI.    <u>NOTICES</u>

110.    Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

<u>To the United States</u>:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611
Re:  DOJ No. 90-5-1-1-09597

and

Chief, Clean Water Enforcement Branch
U.S. Environmental Protection Agency
Region 4
61 Forsyth Street
Atlanta, Georgia  30303

Office of Water Legal Support
Office of Environmental Accountability
U.S. Environmental Protection Agency
Region 4
61 Forsyth Street
Atlanta, Georgia  30303

<u>To SCDHEC</u>:

Elizabeth A. Dieck, Director of Environmental Affairs
Department of Health and Environmental Control
State of South Carolina
2600 Bull Street,
Columbia, South Carolina  29201

and

David Wilson, Chief
Bureau of Water
Environmental Quality Control
Department of Health and Environmental Control
2600 Bull Street
Columbia, South Carolina  29201

To Timmonsville:

Mayor
Town of Timmonsville
P.O. Box 447
Timmonsville, South Carolina  29161

and

Eleazer Carter, Esq.
The Carter Law Firm
105 South Brooks Street
Manning, South Carolina  29102

To Florence:

Drew Griffin, City Manager
City of Florence
The City Center
324 West Evans Street
Florence, South Carolina  29501-3456

and

James W. Peterson, Jr., Esq.
Clarke, Johnson, Peterson & McLean P.A.
P.O. Box 1865
Florence, South Carolina  29503

111.    Any Party may, by written notice to the other Parties, change its designated notice

recipient or notice address provided above.

112.    Notices submitted pursuant to this Section shall be deemed submitted upon

mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties

in writing.

## XVII.    <u>EFFECTIVE DATE</u>

113.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Defendant hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date.  In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XVIII.    <u>RETENTION OF JURISDICTION</u>

114.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XII (Dispute Resolution) and XIX (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## XIX.    <u>MODIFICATION</u>

115.    Upon approval and entry of this Consent Decree by the Court, the terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by the United States, SCDHEC, and Florence or by further order of the Court.  Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.  Non-material changes to this Consent Decree (including Appendices) may be made by written agreement of the Parties without Court approval.

116.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section XII of this Decree (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 94, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Fed. R. .Civ. P. 60(b).

## XX.     TERMINATION

117.    Defendant shall achieve final compliance with all terms of this Consent Decree no later than five (5) years after the Effective Date of this Consent Decree.  All Work required under this Consent Decree shall be completed by that time. Except as provided in Paragraph 103, this Consent Decree is subject to termination, in whole or in part, after Defendant Certifies that it has met all requirements of this Consent Decree, including: (a) payment of all stipulated penalties due; (b) submission and approval of all plans required in Sections VI through IX or any amendment to this Consent Decree; and (c) completion of all Work and implementation of all the requirements in the Deliverables required in Sections VII through IX of this Consent Decree or any amendment to this Consent Decree.  Defendant may serve upon the United States and SCDHEC a Request for Termination, Certifying that Defendant has satisfied those requirements, together with all supporting documentation.  The EPA's determination that the Consent Decree should be terminated shall be based on a consideration of whether all of the requirements listed above have occurred, after consultation with SCDHEC.

118.    Following receipt by the United States and SCDHEC of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the

requirements for termination of this Consent Decree.  If the United States, after consultation with

SCDHEC, agrees that this Consent Decree may be terminated, the United States, SCDHEC, and

Defendant shall submit, for the Court's approval, a joint stipulation terminating this Consent

Decree.

119.    If the United States, after consultation with SCDHEC, does not agree that the

Consent Decree may be terminated, Defendant may invoke Dispute Resolution under Section

XII of this Consent Decree.  However, Defendant shall not seek Dispute Resolution of any

dispute regarding termination until ninety (90) Days after service of its Request for Termination.

### XXI.      PUBLIC PARTICIPATION

120.    This Consent Decree shall be lodged with the Court for a period of not less than

thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United

States reserves the right to withdraw or withhold its consent if the comments regarding the

Consent Decree disclose facts or considerations indicating that the Consent Decree is inappro-

priate, improper, or inadequate.  Timmonsville and Florence consent to entry of this Consent

Decree without further notice and agree not to withdraw from or oppose entry of this Consent

Decree by the Court or to challenge any provision of this Consent Decree unless the United

States has notified Timmonsville and Florence in writing that it no longer supports entry of this

Consent Decree.

### XXII.      SIGNATORIES/SERVICE

121.    Each undersigned representative of Timmonsville, Florence, SCDHEC, and the

Assistant Attorney General for the Environment and Natural Resources Division of the United

States Department of Justice certifies that he or she is fully authorized to enter into the terms and

56

conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

122.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Timmonsville and Florence agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

123.    The Parties agree that Timmonsville and Florence may forestall filing their Answers pursuant to Fed. R. Civ. P. 12(a)(1)(A)(ii), and the Court, by entering this Order, approves this agreement.

## XXIII.    INTEGRATION

124.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Other than the Appendices, which are attached to and incorporated in this Consent Decree, and deliverables that are subsequently submitted and approved pursuant to this Consent Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.

125.    The Agreement to Convey Utility and Grant Franchise between Timmonsville and Florence, which is attached hereto as Attachment 1 for informational purposes only, is expressly not incorporated into this Consent Decree.  The Parties agree that any and all liability deriving

from the Agreement to Convey Utility and Grant Franchise does not adhere to the United States or SCDHEC.

## XXIV.    **FINAL JUDGMENT**

126.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, SCDHEC, Timmonsville, and Florence.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXV.    **APPENDICES**

127.    The following appendix is attached to and part of this Consent Decree:

Appendix A:            List of Items that Must Be Included with NPDES WET Reports

Dated and entered this 26th day of November, 2013.


                 s/R. Bryan Harwell
                 The Honorable R. Bryan Harwell
                 UNITED STATES DISTRICT JUDGE
                 District of South Carolina
                 Florence Division

WE HEREBY CONSENT to the entry of this Consent Decree in *United States, et al. v. Town of Timmonsville, et al.*, No. 4:13-cv-01522-RBH, subject to the public notice and comment provisions of 28 C.F.R. § 50.7(c):

FOR PLAINTIFF UNITED STATES OF AMERICA:


ROBERT G. DREHER
Acting Assistant Attorney General
U.S. Department of Justice
Environmental and Natural Resources Division


WILLIAM WEINISCHKE
Attorney of Record for United States
Trial Attorney
U.S. Department of Justice
Environmental and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C.  20044-7611
Telephone: (202) 514-4592

60

WE HEREBY CONSENT to the entry of this Consent Decree in *United States, et al. v. Town of Timmonsville, et al.*, No. 4:13-cv-01522-RBH, subject to the public notice and comment provisions of 28 C.F.R. § 50.7(c):

FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):


WILLIAM N. NETTLES
United States Attorney
District of South Carolina


BETH DRAKE
Attorney of Record for United States
Assistant United States Attorney
District of South Carolina
1441 Main Street
Suite 500
Columbia, South Carolina 29201
Telephone: (803) 929-3000

61

WE HEREBY CONSENT to the entry of this Consent Decree in *United States, et al. v. Town of Timmonsville, et al.*, No. 4:13-cv-01522-RBH, subject to the public notice and comment provisions of 28 C.F.R. § 50.7(c):

FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):


V. ANNE HEARD
Acting Regional Counsel
United States Environmental Protection Agency
Region 4
61 Forsyth Street
Atlanta, Georgia  30303


SUZANNE K. ARMOR
Associate Regional Counsel
United States Environmental Protection Agency
Region 4
61 Forsyth Street
Atlanta, Georgia  30303
Telephone:  (404) 562-9701

WE HEREBY CONSENT to the entry of this Consent Decree in *United States, et al. v. Town of Timmonsville et al.*, No. 4:13-cv-01522-RBH, subject to the public notice and comment provisions of 28 C.F.R. § 50.7(c):

FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):

SUSAN SHINKMAN
Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, D.C.  20004

ROBERT D. FENTRESS
Attorney Advisor
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Mail Code:  2243A
1200 Pennsylvania Avenue, NW
Washington, D.C.  20004

WE HEREBY CONSENT to the entry of this Consent Decree in *United States, et al. v. Town of Timmonsville, et al.*, No. 4:13-cv-01522-RBH, subject to the public notice and comment provisions of 28 C.F.R. § 50.7(c):

FOR THE SOUTH CAROLINA DEPARTMENT OF
HEALTH AND ENVIRONMENTAL CONTROL:

JACQUELYN S. DICKMAN
Deputy General Counsel
South Carolina Department of
   Health and Environmental Control
2600 Bull Street
Columbia, South Carolina  29201

ELIZABETH A. DIECK
Director of Environmental Affairs
South Carolina Department of
   Health and Environmental Control
2600 Bull Street
Columbia, South Carolina  29201

ROGER P. HALL
Senior Counsel
South Carolina Department of
   Health and Environmental Control
2600 Bull Street
Columbia, South Carolina  29201
Telephone: (803) 898-3350

64

WE HEREBY CONSENT to the entry of this Consent Decree in *United States, et al. v. Town of Timmonsville, et al.*, No. 4:13-cv-01522-RBH, subject to the public notice and comment provisions of 28 C.F.R. § 50.7(c):

FOR DEFENDANT TOWN OF TIMMONSVILLE, SOUTH CAROLINA:

MAYOR DARRICK JACKSON
Town of Timmonsville, South Carolina
P.O. Box 447
Timmonsville, South Carolina  29161


ELEAZER CARTER
The Carter Law Firm
P.O. Box 187
105 South Brooks Street
Manning, South Carolina  29102
Telephone:  (803) 435-0550

WE HEREBY CONSENT to the entry of this Consent Decree in *United States, et al. v. Town of Timmonsville, et al.*, No. 4:13-cv-01522-RBH, subject to the public notice and comment provisions of 28 C.F.R. § 50.7(c):

FOR CITY OF FLORENCE, SOUTH CAROLINA:

13 August 2013

MAYOR STEPHEN J. WUKELA
City of Florence, South Carolina
City Center
324 West Evans Street
Florence, South Carolina  29501


JAMES W. PETERSON, JR.
Clarke, Johnson, Peterson & McLean P.A.
P.O. Box 1865
Florence, South Carolina  29503

66

**Appendix A**

**ITEMS THAT MUST BE INCLUDED WITH NPDES WET REPORTS**

1.  All Chain-of-Custody Forms
    a.  Facility information
        i.   Facility Name
        ii.  Site Description
        iii. State/County
        iv.  NPDES #, Pipe #
    b.  Sample Type (Grab vs. Composite)
        i.   Collected By
        ii.  Start and Stop Time (If Composite)
        iii. Sample Chilled?
    c.  General Information
        i.    Sample ID
        ii.   Collector
        iii.  Date and Time of Collection
        iv.   Temperature at Collection
        v.    # Containers
        vi.   Volume
        vii.  Preservative (ex: Ice)
        viii. Parameter being tested
        ix.   Lab ID#
    d.  Sample Custody Transfer Record (signed relinquish and receive with date and time)
    e.  Sample Transport Info
        i.   Method of Transport
        ii.  Carrier
        iii. Carrier Signature
    f.  Receipt at Laboratory
        i.   Relinquished by ad Received By signatures
        ii.  Date and Time of Receipt
        iii. Name of Organization (Lab) receiving the sample
        iv.  Arrival Temperature of Sample

2.  All Reference Toxicant Data for Each Organism Used or Monthly QA/QC Reference Toxicant Data

3.  All Raw Data Pertaining to the WET tests
    a.  Bench Sheets
        i.   Results broken down by replicate and test day for each test concentration and the control
        ii.  Any relevant means (i.e. mean of # of young produced for each concentration and control during *Ceriodaphnia dubia* chronic test,

mean weight for each concentration and control of *Pimephales promelas* in a chronic test, etc.)

    iii. Date and Time test began and ended

    iv. Date and Time of Renewals (if applicable)

    v. Date and Time of Use of Each Sample (i.e. 1st, 3rd, 5th day collected samples in a chronic test)

    vi. All physical and chemical measurements

    vii. How often Fed, date and time

    viii. # of organisms per chamber

  b. Age of Test Organisms

4. All Statistical Results/Calculations

  a. State Test Results: Clearly Identify Chronic and/or Acute Results (i.e. IC25s for survival and reproduction or growth for chronic tests, and % Mortality in the 100% Effluent Concentration at 48 Hours)

  b. Include any relevant graphs (i.e. Concentration-Response Graphs, etc.)

  c. Include any relevant statistical analysis results

  d. Percent Survival in the Control for each test

A-2